IN THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION
MUNICIPAL COURT
- - -
COMMONWEALTH :
:
vs. : MC-51-CR-0020604-2014
:
AARON MCCOY :
- - -
PRELIMINARY HEARING
- - -
OCTOBER 9, 2014
- - -
COURTROOM 806
CRIMINAL JUSTICE CENTER
PHILADELPHIA, PENNSYLVANIA
- - -
BEFORE: THE HONORABLE TERESA DENI, J.
- - -
NANCY SEIGAFUSE MCNEELY, RPR



APPEARANCES:
KRISTIN KEMP, ESQUIRE
ASSISTANT DISTRICT ATTORNEY
FOR THE COMMONWEALTH
STEPHEN O'HANLON, ESQUIRE
FOR THE DEFENDANT
NANCY SEIGAFUSE MCNEELY, RPR



INDEX


| WITNESS | DR | CR | RDR | RCR |
|---|---|---|---|---|
| LOLITA HENAGAN | 4 | 14 | | |


- - -
NANCY SEIGAFUSE MCNEELY, RPR



COURT CRIER: Case number 3 on Her Honor's list.
MS. KEMP: Your Honor, Commonwealth is amending for the charge of aggravated assault under section 2702 for attempt to cause serious bodily injury.
In addition, Your Honor, the dates on the complaint, it only has one date of January 24. It actually should be a date range from the 24th to the 27th.
THE COURT: Motion to amend is granted. Call your witness.
MS. KEMP: At this time Commonwealth calls Lolita Henagan.
LOLITA HENAGAN, L-O-L-I-T-A, H-E-N-A-G-A-N, having been duly sworn, was examined and testified as follows:
- - -
DIRECT EXAMINATION
- - -
BY MS. KEMP:
Q. Ma'am, you have to talk nice and loud
NANCY SEIGAFUSE MCNEELY, RPR

A. Vaginal.
Q. And let's start with the oral. How did he force you to do that against your will?
A. Grabbed me by my neck.
THE COURT: He what?
THE WITNESS: Grabbed the back of my neck.
Q. Did you say anything to him at that point?
A. Yes, ma'am.
Q. What did you say to him?
A. I asked him to stop.
Q. You asked him to stop?
THE COURT: I cannot hear her.
THE WITNESS: I asked him to stop.
THE COURT: Okay.
BY MS. KEMP:
Q. Did he stop?
A. No, ma'am.
Q. What part of his body touched what part of your body at that point?
A. Do I have to answer that question?
Q. You do, ma'am.





A. His penis, my mouth, and my vagina.
Q. On the outside or the inside as well?
A. The inside as well.
Q. Did he say anything to you when you told him don't and to stop?
A. Only thing I remember him saying is that he wasn't fucking playing.
THE COURT: He wasn't what?
MS. KEMP: He wasn't fucking playing.
BY MS. KEMP:
Q. Now, other than the sexual assaults, did the defendant do anything else with his hands?
A. Pinned me to the bed.
Q. What part of your body did he hold down?
A. My neck.
Q. What was he holding your neck down with?
A. His hands.
Q. How were his hands positioned on your neck?
A. Like this.
MS. KEMP: Indicating for the



record a grabbing motion around both sides of the neck.
BY MS. KEMP:
Q. Did he apply pressure to your neck at that point?
A. Yes, ma'am.
Q. Did it affect your ability to breathe?
A. Not really.
Q. Did it prevent you from moving?
A. Yes, ma'am.
Q. Did you feel that you were free to leave at that point?
A. Free?
Q. To leave?
A. After it was over I did. I just went to the other room and balled up.
THE COURT: You went in the other room and did what?
THE WITNESS: Balled up in the bed and cried.
BY MS. KEMP:
Q.

Q. During the course of that three day
period were you permitted to eat any food?
A. I didn't have any food at all.
THE COURT: What do you mean, what three day period? We were talking about from the 25th to the 27th.
What do you mean was she permitted to eat any food? I don't understand what you're asking her.
MS. KEMP: I'm asking -- the defendant prevented her from eating food during that period of time.
THE COURT: Did she say that?
MS. KEMP: That's why I asked if she was permitted to eat food.
THE COURT: I think she should be able to tell the story. You made a complaint, we're here to listen. What happened?
THE WITNESS: I don't remember all of it. This happened a long time ago.
BY MS. KEMP:
Q. Is everything that you told us about





things that you did remember from those
days?
A. Is it -- say it again.
Q. Is everything you told us today what
you do remember from those days?
A. Yes, yes, ma'am.
MS. KEMP: Your Honor, I don't have anything further at this time.
THE COURT: Your witness.

- - -

CROSS-EXAMINATION

- - -

BY MR. O'HANLON:
Q. Good afternoon, Miss Henagan.
A. Yes.
Q. And you were living at this property,
you were -- were you renting this property
from Mr. McCoy?
A. No. I was living with him.
Q. And was there another girlfriend also
living there with him?
A. No, not that I remember.
Q. Do you remember a woman by the name of
Cramelia Watkins also living there?
A. No, sir.





Q. And the first day you said on January
24, right, that was the first day that all
this started?
A. I really don't remember dates.
Q. Okay.
A. It just happened a long time ago, it
was almost a year ago.
Q. If you don't remember dates, was the
first day that this kind of negative
interaction, was that the day that you told
him that you were pregnant?
A. Yes, sir.
Q. Did you eventually have this child?
A. I already had the child.
Q. Where is that child now?
A. DHS.
Q. Do you have any other children living
with you at this time?
MS. KEMP: Objection to the relevance, Your Honor.
THE COURT: Sustained.
BY MR. O'HANLON:
Q. So you told him that you were pregnant
and that's when all this negative stuff
started to happen; is that correct?





A. Yes, but before that it was just
verbal.
Q. And you said he threw you down half a
flight of stairs; is that correct?
A. He pushed me.
Q. Whereabouts were those stairs?
A. They were in the house right when you
walk in the door. They're right there.
Q. And you don't remember how many steps
there were?
A. No, sir.
Q. And when he pushed you down the
stairs, you said that you injured your head;
is that correct?
A. My neck. I had to wear a neck brace,
and other than that my ankle was messed up.
Q. You don't know how your ankle injury
happened to you?
A. My ankle injury happened from falling
down the stairs. I twisted my ankle.
Q. How long did you have to wear that
neck brace for?
A. They told me to wear it for four to
five weeks and I didn't feel as though I
needed it. My neck wasn't hurting me.

Q. So what was wrong with your neck? How did your neck feel?
A. It just felt like a strong sharp pain but not something that I needed a neck brace for.
Q. Okay. And then you testified that he forced you to have oral sex and vaginal sex; is that correct?
A. Yes, sir.
Q. Did that happen on the same day you told him about your pregnancies or did that happen on another day?
A. I don't remember, sir.
Q. How many days did it happen?
A. I can't remember off the back, I don't know. I don't want to do this.
Q. You don't remember?
A. No, sir.
Q. Did it in fact happen?
A. Yes, sir.
Q. How many times?
A. Do I have answer this question over again? I already wrote a whole statement on this.
Q. You gave a statement to the police?





A. Yes.
Q. Do you suffer from any mental health problems?
MS. KEMP: Objection, Your Honor.
THE COURT: Overruled.
MR. O'HANLON: It goes to the competency of her testimony.
THE COURT: Overruled. She can answer the question.
THE WITNESS: Bipolar.
BY MR. O'HANLON:
Q. Does it affect your memory in any way?
MS. KEMP: Objection, Your Honor.
THE COURT: Overruled.
THE WITNESS: No.
BY MR. O'HANLON:
Q. Okay. Well, if I could ask you the question again, I mean, I know it's terribly hard for you but it's also, you know, important for Mr. McCoy as well. You testified that he raped you, and my question is once again how many times did he rape you?





THE COURT: Counsel, he's charged with one count. Do you want her to come up with additional counts?
MR. O'HANLON: Well, there's an allegation of a course of conduct. Okay.
BY MR. O'HANLON:
Q. On which date then did he vaginally rape you? Was it on the day you told him you were pregnant or the day after that?
A. I can't, I cannot do this. This is too much. I can't take it.
THE COURT: I can't hear you.
THE WITNESS: This is really too much for me to take. Like I really can't do this.
THE COURT: Do you want a break?
THE WITNESS: No.
MS. KEMP: I'm not sure if counsel has more questions.
THE COURT: Do you want a break?
THE WITNESS: No, ma'am.
THE COURT: Then go ahead and ask your question.





BY MR. O'HANLON:
Q. The question was again you remember the day which was the first date that all of this started when you told him that you were pregnant and he pushed you down the steps, right. You remember that; right?
A. I remember bits and pieces.
Q. Now, my question was to you, and I'm sorry I have to ask you this, was it the same day that you told him about being pregnant and being pushed down the steps?
A. I don't remember. I just don't. I don't remember.
Q. Do you remember how it came about that -- how did it come about? You said with regard to him forcing you to give him oral sex that he put his hands around your neck. Do you remember that?
A. Yes. And I thought he was playing in the beginning but I realized he wasn't.
THE COURT: You thought what?
THE WITNESS: I thought he was playing around with me, like trying to turn me on, but I realized he wasn't.
Q. And how did you come to realize that

he wasn't playing?
A. Because he said he wasn't fucking playing.
Q. And what did he do then? Did he pull your head towards his penis?
A. Yes.
THE COURT: I'm going to tell you not to put words in her mouth either. It's her complaint, ask her what happened.
MR. O'HANLON: It's cross-examination but that's fine.
BY MR. O'HANLON:
Q. And then was it in the same course of conduct when he raped you vaginally? Was it in the same episode or a different day?
A. Yes, it was the same episode.
Q. It was the same episode? Is that what you said?
A. Yes.
Q. And when he forces -- what happened with regard to his penis and your vagina? Can you tell me what happened?
MS. KEMP: Your Honor, I'm going to object. It doesn't rebut a prima





fascia case to get into the specific details of the offense.
THE COURT: I don't know what you mean. I don't understand your question.
MR. O'HANLON: I mean, Your Honor, with regard to the being forced to give him oral sex, she described the physical nature of the force.
THE COURT: You can ask her about ejaculation.
MR. O'HANLON: No, I'm asking about the penetration and the force that surrounded it.
THE COURT: Okay. Then ask her that.
BY MR. O'HANLON:
Q. Ma'am, when he put -- did he in fact put his penis inside of your vagina?
A. Yes.
Q. And how did he force himself upon you? Did he pull you on top of him or did he get on top of you?
A. He pinned me down.
Q. He pinned you down and he got on top





of you; is that what you're saying?
A. Yes.
Q. Did he threaten you?
A. Yes.
Q. What did he say to you?
A. Don't tell nobody or he was going to get his best friend to fight me.
Q. Did he hit you in any way?
A. I can't remember.
Q. Now, you said that after this incident you somehow got -- you went to the corner a couple of times you said; is that correct? You got out of the house and went to the corner?
A. I went to the corner and I walked from the corner after passing out from the corner and getting up, I walked to the bus stop, called 911 after calling outreach.
Q. Okay. Did the ambulance come and take you to the hospital?
A. Yes, sir.
Q. And how long were you in the hospital for?
A. I don't remember.
Q. Did he ever like -- I know he was on





top of you you testified when he was raping you, did he ever try and stop you from leaving the house?
A. Not that I remember.
Q. Besides the ankle injury and the neck injury, did you have any other injuries?
A. No, I don't know.
Q. Is that a no?
MS. KEMP: She said no, Your Honor, it's been asked and answered.
Q. As a result of your mental health issues, have you ever made complaints like this in the past?
MS. KEMP: Objection.
THE COURT: Sustained.
BY MR. O'HANLON:
Q. Have you ever made complaints like this in the past?
MS. KEMP: Objection, Your Honor.
THE COURT: Sustained.
BY MR. O'HANLON:
Q. You testified that he was your boyfriend at this time?
A. Yes.